## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

KAREN ABRAUGH                           CIVIL ACTION NO. 20-252

VERSUS                                  JUDGE ELIZABETH E. FOOTE

BILL ALTIMUS, ET AL.                    MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court are ten motions to dismiss.[1] Together, they seek dismissal of all claims stemming from the death of Randall Abraugh ("Abraugh") while detained at Bossier Maximum Security Facility ("BPMS"). Plaintiff Kelsey Abraugh has filed a consolidated response.[2] The motions are ripe and ready for review.

### BACKGROUND

Authorities booked Randall Abraugh into the BPMS as a pretrial detainee.[3] He had a history of mental health treatment and was both medicated and intoxicated at intake.[4] This was acknowledged, at least in part, during Abraugh's booking process.[5] Medical staff identified Abraugh as "a detainee who should be followed for alcohol withdrawal syndrome and possible delirium tremens."[6] Despite that identification, the complaint says prison officials placed Abraugh in a cell without an operable water source and failed to monitor him or provide any medication or liquids.[7] The next day, officials found him

---

[1] Record Documents 108, 123, 124, 125, 126, 127, 128, 129, 130 & 131.
[2] Record Document 136.
[3] Record Document 44 at 7.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

hanging from his bedsheets.[8] After emergency medical personnel restored Abraugh's cardiac function, he was transported to a hospital, where he eventually died from "untreated symptoms of alcohol and benzodiazepine [Xanax] withdrawal and delirium tremens."[9] Abraugh's mother, Karen Abraugh ("Karen"), filed a complaint individually and on behalf of Abraugh's estate. She brought claims against several BPMS and Bossier Parish officials for civil rights violations under 42 U.S.C. § 1983 and Louisiana's survivorship statutes.

Karen, however, was not Abraugh's only surviving family member. When Abraugh died, he left behind other relatives, including a minor child, M.A., and a wife, Kelsey Abraugh ("Kelsey"). This was important because children and spouses are in a higher class of survivors than parents under Louisiana's survivorship provisions. La. Civ. Code arts. 2315.1(A) & 2315.2(A). That meant M.A. and Kelsey, rather than Karen, had the legal authority to bring this lawsuit on Abraugh's behalf. Though Karen later amended the complaint to add the proper plaintiffs, she did so after the statute of limitations had run. Recognizing this, Defendants moved to dismiss Karen's lawsuit, arguing that Karen was the wrong plaintiff from the outset and lacked standing to amend her complaint.[10]

The Court agreed and dismissed Karen's complaint for lack of Article III standing; it reasoned that Karen could not cure the original jurisdictional defect by adding M.A. and Kelsey as parties to this action.[11] But on appeal, the Fifth Circuit concluded otherwise, holding instead that Karen lacked "prudential standing" rather than Article III

---

[8] *Id.* at 8.
[9] *Id.* at 9.
[10] Record Document 89 at 3–4.
[11] *Id.* at 15.

standing. *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022). The distinction proved consequential as prudential standing does not present a jurisdictional question. *Id.* at 304. In other words, while Karen lacked the statutory authority to recover under state law, she maintained the constitutional standing to be heard in federal court.

The Fifth Circuit remanded the case to consider two questions in the "first instance." *Id.* at 305. The first issue was whether the claims of the statutorily authorized plaintiffs—M.A. and Kelsey—related back to Karen's original complaint. *Id.* But that issue is now moot: The parties dismissed M.A. from this action and stipulated that Kelsey's claims related back to Karen's original complaint.[12] The second question was whether the "State Defendants"—Board of Supervisors of Louisiana State University Agricultural and Mechanical College ("LSU Board"), State of Louisiana Office of Risk Management ("ORM")—are protected under the sovereign immunity doctrine. *Id.* at 306. On that basis, the Court will proceed with the sovereign immunity inquiry below.

## LAW & ANALYSIS

### I.      Sovereign Immunity

The State Defendants seek dismissal of all claims against them under Federal Rule of Civil Procedure 12(b)(1).[13] A case is properly dismissed under this Rule "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).

---

[12] Record Document 121.
[13] Record Documents 108 & 129.

The relevant question raised in these motions is whether the Court can exercise jurisdiction over the State Defendants.

The answer is no. "States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *Alden v. Maine*, 527 U.S. 706, 713 (1999). This principle is made explicit in the Eleventh Amendment, which bars suits brought by a citizen against a state in federal court unless that state consents to the suit or Congress says otherwise. U.S. Const. amend. XI; *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). Here, Louisiana has not given its consent to be sued in federal courts. It has, on the contrary, refused to waive its Eleventh Amendment immunity by statute. *See* La. Rev. Stat. § 13:5106(A) ("No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court.").

That protection from suit, or "sovereign immunity," also extends to lawsuits against Louisiana's "agenc[ies] or other political entit[ies] . . . deemed the 'alter ego' or an 'arm' of the State."[14] *Vogt*, 294 F.3d at 688–89 (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)). As pertinent here, courts have established that the LSU Board and the ORM are "arms of the state" entitled to sovereign immunity.[15] *See Pastorek v. Trail*, Nos. 99-30317 & 99-31146, 2001 WL 85921, at *2 (5th Cir. Jan. 26, 2001) (per curiam); *McFarland v. Off. of Risk Mgmt.*, No. 14-0407, 2015 WL 419715, at *2 (E.D. La.

---

[14] Nor is the state or its officials "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).
[15] The official capacity claim against Dr. Russell Roberts, an employee of the LSU Board, must also be dismissed because official capacity suits are not suits against officials, but suits against the official's state office. *See id.*

4

Jan. 30, 2015). For these reasons, the State Defendants' motion is **GRANTED**. All claims against the LSU Board and ORM are **dismissed without prejudice** for lack of subject-matter jurisdiction.

## II.    Failure to State a Claim

Having resolved the sovereign immunity issue "in the first instance," *Abraugh*, 26 F.4th at 306, the Court will next address the pending motions filed by the remaining Defendants. The Bossier Parish Police Jury; Bossier Parish, Louisiana; Bill Altimus; James Cochran; Sherriff Julian Whittington; and Warden Rodney Boyer move to dismiss Kelsey's federal and state claims under Federal Rule of Civil Procedure 12(b)(6). These Defendants all argue that Kelsey's pleadings fail to state a viable claim for relief. Defendants Dr. Susan Tucker, Dr. Anita Flye, Dr. Russell Roberts in his individual capacity, Nurse Farrington, and Nurse Cynthia Holley have also filed motions to dismiss this case for similar reasons. Yet these Defendants also contend dismissal is appropriate for Kelsey's medical negligence claims under Louisiana law; they argue that she failed to complete a state-mandated process before filing suit. The Court will address these arguments below.

### A.  Legal Standard

To survive a motion to dismiss brought under Rule 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing

that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court must accept as true all of the factual allegations in the complaint in determining whether a plaintiff has stated a plausible claim. *See Twombly*, 550 U.S. at 555; *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

If a complaint cannot meet this standard, it may be dismissed for failure to state a claim upon which relief can be granted. *Iqbal*, 556 U.S. at 678–79. A court may dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). If a complaint cannot meet this standard, it may be dismissed for failure to state a claim upon which relief can be granted. *Iqbal*, 556 U.S. at 678–79. A court does not evaluate a plaintiff's likelihood for success but instead determines whether a plaintiff has pleaded a legally cognizable claim. *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

### B.  Section 1983

Kelsey's complaint challenges Defendants' allegedly unconstitutional conduct under 42 U.S.C. § 1983. That statute provides a cause of action against anyone acting under the color of state law who "subjects" a person or "causes [a person] to be subjected . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.[16] Since Congress adopted § 1983, it has become the primary civil remedy for enforcing federal constitutional and statutory rights. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law-Substance & Procedure* § 19:13 (May 2021).

In some circumstances, however, state actors are immune from § 1983 lawsuits and other legal challenges under the doctrine of qualified immunity. Qualified immunity shields government officials from liability for claims against them in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Though all officials here raise qualified immunity in their motions to dismiss, addressing that defense at the outset may prove premature. As a threshold matter, courts must first "determine whether the plaintiff has 'filed a short and plain statement of his complaint, a statement that rests on more than conclusions alone.'" *Pena v. City of Rio Grande City*, 879 F.3d 613, 618 (5th Cir. 2018) (quoting *Anderson v. Valdez*, 845 F.3d 580, 589–90 (5th Cir. 2016)). "Only after the regular

---

[16] Except for the State Defendants dismissed from this lawsuit above, the remaining Defendants do not dispute whether they were "acting under the color of state law" when the incidents that form the basis of this lawsuit transpired.

pleading requirement is satisfied" should courts proceed with the qualified immunity analysis. *Id.*

With that principle in mind, the Court will first consider whether Kelsey's complaint states a plausible claim for relief against individual Defendants. Because Abraugh was a pretrial detainee when Defendants allegedly violated his constitutional rights, Kelsey's lawsuit invokes the Fourteenth Amendment. This Amendment secures a pretrial detainee's right to be protected from impermissible punishment like denials of, or delays in, providing medical care. In this case, Kelsey alleges that BPMS officials disregarded Abraugh's serious medical needs after identifying him as suffering from severe withdrawal symptoms. Such an omission, Kelsey contends, was condoned by a Parish and Sherriff that endorsed or acquiesced to unconstitutional conduct.

Constitutional challenges raised by pretrial detainees can take one of two tracks, and how the challenge is classified determines its analysis. *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997). One acceptable theory of recovery is based on "conditions of confinement." A condition of confinement claim arises when "a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Such a claim may result, for instance, when the sanitation of a building is inadequate or the food or heating creates miserable conditions. *Scott*, 114 F.3d at 53. Put simply, a viable condition of a confinement case must rely upon a systemwide defect causing a plaintiff harm.

But systemwide defects are not the sole source of Fourteenth Amendment violations. Sometimes, the fault stems from jail employees whose actions or omissions

cause harm. Cases raising such issues fall into the second category of Fourteenth Amendment cases: those based on "episodic-acts-or-omissions." *Id.* Under this category of Fourteenth Amendment lawsuits, "an actor" is typically "interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.*

Kelsey does not explicitly identify which of those two tracks she intends to pursue. Yet, in distilling her claims against Defendants, Kelsey explained that she bases this lawsuit "upon Defendants either ignoring Randall Abraugh or abdicating a duty that led to his death."[17] Because, in Kelsey's words, this case turns on Defendants' "personal actions and omissions,"[18] her Fourteenth Amendment lawsuit is appropriately classified as one challenging episodic acts or omissions rather than conditions of confinement. *See id.*

The relevant inquiry, then, is whether an official breached his or her constitutional duty to tend to the basic human needs of the persons in his or her charge. A plaintiff must prove three elements for an official to be held liable for their episodic act or omission. *Hare*, 74 F.3d at 645. First, the plaintiff must show that the pretrial detainee was exposed to a substantial risk of serious harm. Second, she must prove that the defendant displayed deliberate indifference to that risk. And third, she must prove that such deliberate indifference harmed the pretrial detainee.

---

[17] Record Document 136-1 at 14.
[18] *Id.*

The first element asks whether a reasonable person would view the detainee's illness or injury as sufficiently serious based on the circumstances. This inquiry does not consider a defendant's state of mind but rather what a reasonable person would conclude. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (holding that "the deprivation alleged must be, objectively, 'sufficiently serious'").

Kelsey's complaint here alleges that Abraugh appeared intoxicated at the BPMS with a long history of mental health issues.[19] As he was booked, medical staff identified Abraugh as an individual undergoing substance withdrawal and possible "delirium tremens."[20] "Delirium tremens, or the 'DTs,' affects roughly 5 percent of alcoholics in the withdrawal stage . . . . The standard signs of delirium tremens include agitation, fever, sweating, tachycardia and tremor." *Thompson v. Upshur County*, 245 F.3d 447, 453 n.2 (5th Cir. 2001) (quoting 9 *Attorneys' Textbook of Medicine* P 59A.22(2) (Gray & Gordy, eds., 3rd ed. 2000)). The condition also causes disorientation so severe that patients "do not know what time it is or where they are." *Id.* Patients may also experience "memory lapses" and "visual hallucinations." *Id.* In Kelsey's telling, at least one other inmate observed Abraugh experiencing severe withdrawal symptoms after his booking.[21] Taking these claims as true, Abraugh's condition was sufficiently serious, and Kelsey meets the first element of this episodic act or omission inquiry. *See Thompson*, 245 F.3d at 457

---

[19] Record Document 44 at 7.

[20] *Id.*

[21] *Id.*

(5th Cir. 2001) ("*Lancaster, Colle* and *Fielder* establish that delirium tremens is a serious medical need.").

Having done so, Kelsey must next adequately plead deliberate indifference. To meet that standard, she must allege that the official(s) knew of and disregarded a substantial risk of serious harm. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (per curiam). This is a challenging undertaking, and pleading negligence or gross negligence will not suffice. *Thompson*, 245 F.3d at 459. Nor can a plaintiff make this showing based on a mere disagreement with the type, amount, or timing of a detainee's medical treatment. *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019).

She must instead show that an official "refused to treat [the detainee], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). Even when such a showing is made, the plaintiff must then prove that the defendant's deliberate indifference caused the detainee harm. *McCarty v. Zapata County*, 243 F. App'x 792, 794 (5th Cir. 2007).

Kelsey alleges that several Defendants were deliberately indifferent to Abraugh's medical needs; the Court will address the allegations against each Defendant below.

### i.    Nurse Holley

The Court begins its deliberate indifference analysis with the only individual Kelsey alleges had direct contact with Abraugh. According to the complaint, Nurse Holley

was a registered nurse for BPMS. Her duties included medical screening, follow-up treatment, and referring detainees to physicians or other medical professionals.[22]

The day Abraugh entered BPMS, Kelsey alleges he was "medicated, intoxicated, confused and removed from reality."[23] The complaint claims that Nurse Holley recognized Abraugh's concerning state; she identified him as a detainee who should be followed for alcohol withdrawal syndrome and possible delirium tremens.[24] After identifying him as such, Kelsey asserts that Nurse Holley failed to notify the medical or mental health staff, investigate Abraugh's mental health history, establish an alcohol or Xanax detoxification plan, or otherwise make any effort to address Abraugh's medical needs.[25] Instead, Kelsey says Nurse Holley sent Abraugh to a general cell without access to water or treatment.[26] Several hours later, he was found hanging by his neck from bed sheets; he died soon after from the "untreated symptoms of alcohol and benzodiazepine withdrawal and delirium tremens experienced."[27] Kelsey contends that Nurse Holley's failure to provide Abraugh the minimum care required under the Constitution resulted in Abraugh's death.

Because Kelsey has alleged facts showing Nurse Holley knew of Abraugh's serious risk of harm yet maintained a wanton or reckless disregard for that risk, she has pled a viable Fourteenth Amendment claim that survives the pleading stage.

ii.    *Supervisory Liability*

---

[22] *Id.* at 5.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.* at 7.
[27] *Id.* at 9.

Kelsey next alleges that the remaining Defendants Altimus, Cochran, Sheriff Whittington, Warden Boyer, Dr. Tucker, Nurse Farrington, Dr. Flye, and Dr. Roberts violated Abraugh's Fourteenth Amendment rights.[28] She claims that these Defendants are liable for their role as supervisors at BPMS.

Under § 1983, supervisory officials are not vicariously liable for the conduct of those under their supervision. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992). They are, however, accountable for their own acts of deliberate indifference and for implementing unconstitutional policies that causally injure the plaintiff. *Id.* Therefore, to hold any supervisor defendants liable under § 1983, Kelsey must allege "either that they participated in acts that caused [Abraugh's] constitutional deprivation or that they implemented unconstitutional policies causally related to his injuries." *Alderson*, 848 F.3d at 421.

As a threshold matter, Kelsey pleads no facts alleging any of these remaining individual Defendants had direct contact with Abraugh or were personally aware of his serious medical needs. She concedes as much in her response to Defendants' motions to dismiss. Consequently, Kelsey has not pled a claim plausibly linking these Defendants with any wrongdoing based on their "direct participation." *Sanchez v. Young County*, 866 F.3d 274, 281 (5th Cir. 2017).

---

[28] Kelsey also brings a claim against Sergeant Bradley Vassar, who she says was employed by the Sherriff and responsible for protecting the BPMS detainees. But Sergeant Vassar was not a party expressly identified or analyzed in the Sheriff's motion to dismiss. As a result, the Court will preserve Kelsey's claims against him in his individual capacity.

Still, as mentioned, supervisors may be liable for a constitutional violation absent overt participation. This occurs when a supervisor "implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008). This is a policy-focused inquiry that often requires a plaintiff to show a "'pattern of similar violations,'" proving the supervisor acted, or failed to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates. *Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019) (quoting *Rios v. City of Del Rio,* 444 F.3d 417, 427 (5th Cir. 2006)). Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [the] employees." *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).

*Parish Governing Officials*. First, Kelsey alleges that Altimus, as Administrator of the Bossier Parish Government, and Cochran, as President of the Bossier Parish Police Jury, entered contracts with healthcare providers and personally established funding policies for the Parish that led to understaffing.[29] How Kelsey seeks to establish supervisor liability against these Defendants is unclear. She does not allege that these individuals supervised BPMS's medical staff. Nor does she attempt to link these Defendants' "understaffing" or "underfunding" policies with Abraugh's denial of medical care at BPMS. For these reasons, Kelsey's pleadings fall far short of stating a viable

---

[29] *Id.* at 10.

cause of action against these Parish officials as supervisors; the claims against Altimus and Cochran are therefore dismissed with prejudice.

*Medical Officials*. Kelsey next challenges the conduct of several medical officials at BPMS: Nurse Farrington, Dr. Tucker, Dr. Flye, and Dr. Roberts. As with her claims against the Parish officials, however, the pleadings against these Defendants are also inadequate. According to her complaint, Kelsey says these officials developed mental and medical care policies. Yet she provides little detail on which of their policies directly affected screening or monitoring procedures. Most importantly, while Kelsey says these Defendants served as supervisors, Kelsey never explains which individual oversaw Nurse Holley or BPMS's intake, screening, or monitoring procedures. As it stands, Kelsey has provided a confusing web of alleged liability and scattershot allegations.  For that reason, the extent of these medical officials' alleged wrongdoing is unclear.

In her response to Defendants' motion to dismiss, however, Kelsey references several facts concerning these Defendants not contained in her original complaint. For instance, Kelsey mentions that Karen contacted BPMS the day Abraugh died to warn medical staff of Abraugh's past overdoses and mental health issues. That such warnings went disregarded, Kelsey claims, was a feature of BPMS's inadequate mental health and medical care policies. Kelsey also discusses medical charts referencing Nurse Farrington's involvement in BPMS's immediate response after Abraugh was found hanging in his cell. Considering Kelsey's lawsuit rests on inadequate medical care, the Court will allow Kelsey to amend her complaint to reassert claims against Nurse Farrington, Dr. Tucker, Dr. Flye, and Dr. Roberts. It may be possible for Kelsey to plead more facts that

plausibly link these Defendants' alleged unconstitutional conduct with Abraugh's inadequate medical treatment.[30] At this time, however, Kelsey has failed to state a supervisory liability claim.

*Sherriff's Office Officials*. Kelsey finally attempts to hold Sheriff Whittington and Warden Boyer liable in their individual capacity as supervisors. At the outset, Kelsey fails to offer facts that could plausibly link Warden Boyer to any unconstitutional conduct. As with the Bossier Parish and medical officials, she fails to explain whether Warden Boyer exercised supervisory control over Holley as a subordinate. Yet unlike the medical Defendants, Kelsey does not contend in her complaint or response that Warden Boyer created policies or failed to create policies that could be causally related to Abraugh's inadequate medical care. Lacking such a connection, the complaint does not explain how he might be legally accountable in a supervisory role for Abraugh's constitutional violation. Her claims against Warden Boyer are, therefore, dismissed with prejudice.

That said, Kelsey makes a better case for holding Sheriff Whittington liable as a supervisor. In contrast to Warden Boyer, Kelsey has alleged that Sheriff Whittington

---

[30] The Court acknowledges that Kelsey has had opportunities to amend her complaint in response to motions to dismiss; it further notes that the procedural history of this case has been extensive and unwieldy. Still, this Court has not yet addressed the plausibility of Kelsey's pleadings with any scrutiny until this ruling. Additionally, Kelsey says facts were recently uncovered through the discovery obtained when addressing the relation-back issue on remand. *See* Record Document 136-1 at 11–13. Though ideally, the Court seeks to avoid a merry-go-round of dispositive motion filing, the Court concludes Kelsey has not yet pled her "best case." *See Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999).

possessed direct "control" over all BPMS staff members as the "commanding officer."[31] In that capacity, Kelsey asserts that the Sheriff established or condoned inadequate medical procedures and customs. Under Sherriff Whittington's watch, Kelsey contends detainees with medical needs were placed in general population without appropriate monitoring or attention. Such a custom, Kelsey argues, materialized in the constitutionally deficient treatment of detainees like Abraugh.

In her response to Defendants' motion to dismiss, Kelsey points to *Fletcher v. Whittington*, No. 18-1153, 2022 WL 3579616, at *1 (W.D. La. Aug. 19, 2022).[32] *Fletcher* concerned an incident occurring before Abraugh's death where a pretrial detainee underwent withdrawal and died from alleged inadequate medical care. Kelsey says *Fletcher* is sufficiently like Abraugh's case and should have placed the Sheriff on notice of BPMS's deficient policies. Even so, Kelsey asserts that Sherriff Whittington continued disregarding pretrial detainees' constitutional rights rather than acting or adopting any measures to abate any withdrawal-related medical risks. *See Anderson v. Dallas County*, 286 F. App'x 850, 861 (5th Cir. 2008). She argues that such a pattern of mistreatment was the moving force behind Abraugh's death.

Because several of Kelsey's allegations are not contained in her complaint, the Court will also grant Kelsey leave to amend her claims against Sherriff Whittington. In doing so, Kelsey should include more facts detailing pertinent incidents outlined in her response and greater detail on the "pattern" of the unconstitutional conduct she is attempting to establish.

---

[31] Record Document 44 at 3–4.
[32] Record Document 136-1 at 13, 24.

17

iii.     *Nurse Holley's Qualified Immunity*

All Defendants raise the qualified immunity defense in their motions to dismiss. As noted above, "[t]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). Analyzing whether the doctrine applies involves a two-step process. First, a court must determine whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a violation has been established, a court must determine "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).

The Court will not address the qualified immunity defense raised by several Defendants as it has granted leave for Kelsey to amend her complaint against Sherriff Whittington, Nurse Farrington, Dr. Tucker, Dr. Flye, and Dr. Roberts. But the Court has concluded that Kelsey has pled a viable Fourteenth Amendment claim against Nurse Holley. Thus, only one step remains in addressing Nurse Holley's qualified immunity defense: determining whether the law at the time of her violation was so "clearly defined that 'a reasonable official would understand that what [s]he is doing violates that right.'" *Murray v. Earle,* 405 F.3d 278, 289 (5th Cir. 2005) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

At this stage in the litigation, the Court concludes that qualified immunity does not bar Kelsey's § 1983 claim against Nurse Holley. Before the events at issue, it was

18

clearly established that officials would be liable for violating "a detainee's clearly established constitutional rights if they 'had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Jacobs v. W. Feliciana Sheriff's Dep't,* 228 F.3d 388, 393–94 (5th Cir. 2000) (quoting *Hare,* 74 F.3d at 650).

As noted above, the Fifth Circuit has established delirium tremens as a serious medical risk. *Thompson*, 245 F.3d at 457. Kelsey has pled facts that plausibly allege that Nurse Holley was aware that Abraugh was suffering from withdrawal and possible delirium tremens but disregarded that risk in violation of the law. Abraugh attempted to hang himself several hours later and allegedly died from untreated withdrawal symptoms and delirium tremens. Accordingly, if Kelsey's claims are true, Holley was "on notice" that denying Abraugh medical care violated his due process rights.

### iv.   Municipal Liability

Having analyzed Kelsey's claims against individual actors, the Court next considers whether Kelsey has pled a claim against "Municipal Defendants," Bossier Parish Police Jury and the Sheriff's Office.[33] In an episodic act or omission case, a municipal entity can be held accountable for an employee's constitutional violation if (1) an employee was *subjectively* deliberately indifferent, and (2) the employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the

---

[33] Kelsey has sued each individual Defendant in their official capacities. Because all these Defendants (except for Dr. Roberts) work for either Bossier Parish or the Sherriff's Office, Kelsey's official capacity claims are duplicative. *See Will*, 491 U.S. at 71. Additionally, the Court treats Bossier Parish and the Bossier Parish Police Jury as the same entity. *See* Record Document 128-1 at 1.

plaintiff's constitutional rights. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999). "A [municipality] acts with objective deliberate indifference if it promulgates (or fails to promulgate) a policy or custom despite 'the "known or obvious consequences" that constitutional violations would result.'" *Anderson*, 286 F. App'x at 861 (quoting *Piotrowski v. City of Houston,* 237 F.3d 567, 579 (5th Cir. 2001)). Yet a city cannot be liable for an unwritten custom unless "'actual or constructive knowledge of such custom'" is attributable to a city policymaker. *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Webster,* 735 F.2d. at 841).

Kelsey contends that the Municipal Defendants consistently failed to monitor and screen detainees with severe medical needs, like delirium tremens. Above, Kelsey has satisfied step one of this liability inquiry by pleading facts showing that Nurse Holley was subjectively deliberately indifferent to Abraugh's medical needs. In an attempt to satisfy step two, Kelsey claims that at least one BPMS policy maker, Sheriff Whittington, had constructive knowledge that Abraugh was denied medical care, couching her municipal liability allegations into three categories: failure to screen, monitor, and train.[34]

To prove constructive knowledge, a plaintiff must show that the defendant's custom was "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In her response, Kelsey again points to the death of another pretrial detainee undergoing Xanax withdrawal, who, like

---

[34] As noted above, Kelsey also contends that Municipal Defendants, through Altimus and Cochran, failed to staff or fund BPMS adequately. This claim serves as another basis for Kelsey's municipal liability claims. But as mentioned above, Kelsey does not plead facts that could plausibly link understaffing or insufficient funding with Abraugh's alleged inadequate medical care. Nor does she elaborate on these theories in her response to Defendants' motions to dismiss.

Abraugh, allegedly died after Municipal Defendants failed to provide adequate screening or monitoring. Kelsey alleges that the widespread lack of screening and monitoring was linked to a policy that resulted in Abraugh being denied attention and proper care. But as mentioned above, Kelsey does not include any past incidents of similar violations in her complaint but instead raises at least one in her response. The Court thus grants Kelsey leave to amend her complaint against Municipal Defendants for failing to monitor and screen detainees.

Kelsey also contends that the Municipal Defendants failed to train and supervise their subordinates. In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *Connick*, 563 U.S. at 61. To support liability under this theory, a municipality's decision not to adopt or promulgate a policy must "amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992). Making such a showing generally requires a plaintiff to prove "notice of a pattern of similar violations at the time the plaintiff's own rights were violated." *Robles v. Ciarletta*, 797 F. App'x 821, 833–34 (5th Cir. 2019). Again, Kelsey points to the detainee's death in *Fletcher* and offers factual allegations in her response not included in her complaint. As with her failure to monitor and screen claims, Kelsey is granted leave to amend this allegation against the Municipal Defendants.

That said, the Court acknowledges that pointing to a pattern of violations is not mandatory to hold a municipality liable for its failure to train. When a plaintiff cannot

establish a pattern of similar offenses, the Fifth Circuit has recognized a "narrow exception" to establish such liability. *Pena*, 879 F.3d at 624. But that exception only applies when a constitutional violation is the "highly predictable consequence" of a municipality's failure to properly hire, train, supervise, or discipline. *Hutcheson v. Dallas County*, 994 F.3d 477, 482 (5th Cir. 2021). A violation is "highly predictable" when the municipality fails "to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Id.* at 482-83 (quoting *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018)). The Court will refrain from addressing whether Kelsey's complaint meets this "especially difficult" standard, *Anderson v. Marshall County*, 637 F. App'x 127, 134 (5th Cir. 2016), without the benefit of her amended complaint. Still, the Court notes that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. And basing a failure to train case on a single incident "is only appropriate in the most egregiously apparent cases." *Cardenas v. Lee County*, 569 F. App'x 252, 258 (5th Cir. 2014).

### C.  State-Law Claims

Finally, all Defendants challenge the adequacy of Kelsey's state law allegations including negligence, indemnification, vicarious liability, survival, and wrongful death. Yet addressing most of these claims would be premature: Kelsey has not exhausted her medical negligence claims before the state medical review panel. Though the process is underway, it is not yet final. Kelsey does not dispute the necessity of the panel but urges

22

the Court to stay the case pending the completion of the panel's review rather than dismiss her claims outright.

Under the Louisiana Medical Malpractice Act, "[n]o action against a health care provider . . . may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel." La. R.S. § 40:1231.8. This process applies to state-law medical malpractice claims filed in federal court. *See Seoane v. Ortho Pharms., Inc.*, 660 F.2d 146 (5th Cir. 1981). On that basis, Kelsey's negligence claims cannot proceed until the medical review panel has issued its decision.

Federal district courts in Louisiana faced with similar situations have determined that stays are warranted in the interest of judicial economy. *See, e.g.*, *Phoenix v. Lafourche Par. Gov't*, No. 19-13004, 2021 WL 184909, at *3, *10 (E.D. La. Jan. 19, 2021) (holding that a stay was appropriate pending completion of the medical review panel in a case where the plaintiffs alleged that defendants' deliberate indifference led to a detainee's suicide); *Evans v. Lopinto*, No. 18-8972, 2019 WL 2995870, at *6 (E.D. La. July 8, 2019) (same).

Here, Kelsey's claims arise from Abraugh's death while he was detained at BPMS under the Defendants' supervision and in Defendants' care. "Discovery will [thus] apply to all interrelated claims. Additionally, the medical review panel's determination may be admissible (though not conclusive) at any trial of this matter." *Phoenix*, 2021 WL 184909 at *16 (citing *Seoane*, 660 F.2d at 149). Consequently, the Court finds a stay is warranted here pending the medical panel's review. Kelsey's remaining state-law claims largely depend on the alleged medical negligence, so the Court will refrain from

23

addressing those claims at this time.[35] Pending the lifting of the stay, all motions to dismiss any state claims are denied with the right to re-urge.

## CONCLUSION

For the reasons outlined above,

**IT IS ORDERED** that the motions to dismiss filed by the Louisiana Office of Risk Management, the LSU Board of Supervisors, and Dr. Russell Roberts in his official capacity [Record Documents 108 & 129] are **GRANTED** to the extent that the claims against these Defendants are **DISMISSED without prejudice** for lack of subject-matter jurisdiction.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by Cynthia Holley [Record Document 123] is **DENIED**.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by Dr. Susan Tucker, Dr. Anita Flye, and Dr. Russell Roberts in his official capacity [Record Document 124] is **DENIED with the right to re-urge**. Kelsey may amend her pleadings against these Defendants to state a plausible claim for relief by October 12, 2023.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by Bill Altimus [Record Document 125] is **GRANTED**. All claims against Altimus are **DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by James Cochran [Record Document 126] is **GRANTED**. All claims against Cochran are **DISMISSED with prejudice**.

---

[35] The Court has also allowed Kelsey to amend her pleadings against several Defendants to add facts that plausibly establish their alleged misconduct.

**IT IS FURTHER ORDERED** that Jessica Farrington's motion to dismiss [Record Document 127] is **DENIED with the right to re-urge**. Kelsey may amend her pleadings against this Defendant to state a plausible claim for relief by October 12, 2023.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by the Bossier Parish Police Jury and Bossier Parish [Record Document 128] is **DENIED with the right to re-urge**. Kelsey may amend her pleadings against the Bossier Parish Police Jury to state a plausible claim for relief by October 12, 2023.

**IT IS FURTHER ORDERED** that the motions to dismiss filed by Sherriff Whittington and Rodney Boyer [Record Documents 130 & 131] are **GRANTED in part and DENIED in part with the right to re-urge**. The motions are **GRANTED** to the extent that all claims against Boyer are **DISMISSED with prejudice**. The motion is **DENIED with the right to re-urge** to the extent that Kelsey may amend her pleadings to assert more factual details concerning Sherriff Whittington's alleged misconduct in his personal and official capacities by October 12, 2023.

**IT IS FURTHER ORDERED** that Defendants' motion to strike [Record Document 137] Kelsey's response for pleading factual details not found in her complaint is **DENIED as moot**.

Finally, considering that the medical state-law medical malpractice claims, which arise from the same factual predicate underlying the federal civil rights claims, have been submitted to a state medical review panel,

**IT IS ORDERED** that the case is hereby **STAYED** until **December 1, 2023,** pending the outcome of the Louisiana medical review panel. On **December 1, 2023,** the parties shall file a joint notice notifying the Court about the status of the medical panel's review. At that time, the Court will determine whether to extend the stay or set a deadline for Plaintiff to file her amended complaint. If the panel's review is complete before December 1, 2023, the parties shall notify the Court as soon as possible. Pending the lifting of the stay, all motions to dismiss any state claims are denied with the right to re-urge.

**THUS DONE AND SIGNED** this 14th day of September, 2023.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE